ZONING BOARD OF APPEALS OF GREENFIELD *vs.* HOUSING
APPEALS COMMITTEE & another.[1]

Franklin. February 18, 1983. — March 30, 1983.

Present: GREANEY, KASS, & WARNER, JJ.

*Housing. Zoning,* Low and moderate income housing, Housing Appeals
Committee. *Words,* "Under permit."

Discussion of G. L. c. 40B, §§ 20-23, providing for the issuance of com-
prehensive permits for the construction of low and moderate income
housing. [555-557]

For purposes of calculating whether a municipality has met its minimum
low and moderate income housing obligation the words "under per-
mit" in a regulation of the Department of Community Affairs, 760
Code Mass. Regs. § 31.04(1) (a) (1978), refer to projects for low and
moderate income housing for which building permits have been issued
and do not include projects in earlier stages. [557-561]

Where a project for elderly housing in a town had been given a Federal
rental assistance contract and a special zoning permit from the town's
zoning board of appeals, but the project was not included in an inven-
tory of low and moderate income housing by the Department of Com-
munity Affairs and had not received a building permit at the time
when a developer applied for a comprehensive permit for the construc-
tion of low and moderate income housing, the Housing Appeals Com-
mittee properly excluded the units in the elderly housing project in cal-
culating whether the town had met its minimum low and moderate in-
come housing obligation. [558-561]

The Housing Appeals Committee has authority under G. L. c. 40B, § 20,
to order issuance of a comprehensive permit for the construction of a
low and moderate income housing project, completion of which will
cause a municipality's ten percent requirement for low and moderate
income housing to be exceeded by a reasonable number of housing
units. [561-562]

CIVIL ACTION commenced in the Superior Court Depart-
ment on July 6, 1981.

[1] The developer, Raymond Daddario.

Motions for summary judgment were heard by *Cross,* J.

*Edward W. Pepyne, Jr.,* Town Counsel, for the plaintiff.

*Joan C. Stoddard,* Assistant Attorney General, for Housing Appeals Committee.

*Robert B. Carlsen* for Raymond Daddario.

GREANEY, J. We have the questions (1) whether the Housing Appeals Committee (HAC) in the Department of Community Affairs correctly determined that, at the time of the developer's application for a comprehensive permit, there did not exist in the town of Greenfield low or moderate income housing units in excess of ten percent of the town's total housing units, and (2) whether HAC could lawfully order the issuance of a comprehensive permit which would result in Greenfield's having more than ten percent of its total housing units devoted to low or moderate income housing.

On December 14, 1979, Raymond Daddario submitted to the town's zoning board of appeals (board) an application for a comprehensive permit pursuant to G. L. c. 40B, §§ 20-23, to construct sixty units of low or moderate income housing on a ten acre site on Homestead Avenue in Greenfield.[2] The board voted unanimously to deny the permit. Daddario appealed to HAC. After hearing, HAC vacated the board's decision and ordered the board to issue Daddario a comprehensive permit. The board sought judicial review (pursuant to G. L. c. 40B, § 22, and G. L. c. 30A, § 14) of HAC's determination that a comprehensive permit should issue, and a declaration (pursuant to G. L. c. 231A) that a development which would result in Greenfield's having more than ten percent of its total housing units devoted to low or moderate income housing cannot lawfully qualify for a comprehensive permit. On cross motions for summary

---

[2] "Low or moderate income housing" is "any housing subsidized by the federal or state government under any program to assist the construction of low or moderate income housing as defined in the applicable federal or state statute, whether built or operated by any public agency or any non-profit or limited dividend organization." G. L. c. 40B, § 20 (inserted by St. 1969, 774, § 1). See also 760 Code Mass. Regs. § 30.02(i) (1978).

judgment (see Mass.R.Civ.P. 56[a] & [b], 365 Mass. 824 [1974]), a judge of the Superior Court filed a written memorandum which, in pertinent part, (a) upheld HAC's decision; (b) found no violation of the enabling legislation by HAC's issuance of a comprehensive permit for a project which would result in Greenfield's having more than the ten percent of low or moderate income housing specified in G. L. c. 40B, § 20; and (c) determined that no valid planning objections were shown by the board sufficient to outweigh the regional need for low or moderate income housing. Although the judge's memorandum disposed of all the issues raised in the rule 56 motions, ordered HAC's decision affirmed, and directed the entry of judgment, a judgment was never entered, as called for by Mass.R.Civ.P. 58(a), 365 Mass. 826 (1974). Because of this, we must dismiss the appeal. Nevertheless, there are circumstances which warrant discussion of the merits of the appeal. These circumstances include the fact that the passage of more than three years since Daddario first sought a comprehensive permit may jeopardize the entire project's feasibility. Additionally, the board's consideration of other projects may be hampered by confusion over whether the town has sufficient low and moderate income housing to meet the "consistent with local needs" criteria of G. L. c. 40B, § 20. For these reasons, and to further the economical administration of justice, we will discuss the merits and leave it to the parties to arrange with the clerk of the Superior Court for the entry of a proper judgment. See *Levy* v. *Bendetson*, 6 Mass. App. Ct. 558, 560-562 (1978); *Rubel* v. *Hayden, Harding & Buchanan, Inc.*, ante 252, 252-253 (1983).

1. *The statutory and regulatory scheme.* To put in context the questions presented, we first discuss the purposes and operation of G. L. c. 40B, §§ 20-23. That statute (popularly known as the anti-snob zoning act) was enacted to provide expeditious relief from exclusionary local zoning by-laws and practices which might inhibit the construction of low and moderate income housing in the Commonwealth's cities and towns. See *Board of Appeals of Hanover*

556 15 Mass. App. Ct. 553

Zoning Board of Appeals of Greenfield v. Housing Appeals Committee.

v. *Housing Appeals Comm.*, 363 Mass. 339, 353-354 (1973) (the *Hanover* case). Under the statute, an eligible developer[3] wishing to construct low or moderate income housing may seek from the local zoning board of appeals a comprehensive permit to develop the project instead of seeking separate approvals from each local board having jurisdiction over the project.[4] G. L. c. 40B, § 21. See *Zoning Bd. of Appeals of Wellesley* v. *Housing Appeals Comm.*, 385 Mass. 651, 656 (1982) (the *Wellesley* case).

If the board denies an application for a comprehensive permit, or authorizes a permit on conditions which would make the project uneconomical, the developer may appeal to HAC. G. L. c. 40B, § 22. On appeal, HAC must conduct a de novo review to determine whether the board's decision is "reasonable and consistent with local needs." G. L. c. 40B, § 23 (inserted by St. 1969, c. 774, § 1). HAC cannot order the issuance of a comprehensive permit, however, where the locality has fulfilled its minimum low or moderate income housing obligation under one of the criteria set forth in G. L. c. 40B, § 20.[5] See the *Wellesley* case, *supra* at 657. The critical criterion in this case is the first one — whether, at the time of the initial application for

---

[3] A qualified developer is a public agency, nonprofit organization or limited dividend organization. G. L. c. 40B, § 21. HAC determined that Daddario's enterprise would meet the requirements for a limited dividend organization. That finding is not disputed on appeal.

[4] This procedure eliminates the need for applications to boards, such as the board of health, the planning board, and the board of selectmen, and officials, such as the building inspector.

[5] A locality has fulfilled its minimum housing obligation "where [1] low or moderate income housing exists which is in excess of ten per cent of the housing units reported in the latest decennial census of the city or town or [2] on sites comprising one and one half per cent or more of the total land area zoned for residential, commercial or industrial use or [3] the application before the board would result in the commencement of construction of such housing on sites comprising more than three tenths of one per cent of such land area or ten acres, whichever is larger, in any one calendar year." G. L. c. 40B, § 20. (The numbers in brackets have been inserted for ease of reference in the body of this opinion.) See the *Hanover* case, *supra* at 366.

a comprehensive permit, low or moderate income housing existed in more than ten percent of the housing units in the latest decennial census of Greenfield.[6] G. L. c. 40B, § 20.

Assuming the municipality has not met its minimum housing obligation, HAC may still uphold denial of the permit as "reasonable and consistent with local needs" if the community's need for low or moderate income housing is outweighed by valid planning objections to the proposal based on considerations such as health, site, design, and the need to preserve open space. G. L. c. 40B, §§ 20-23. See the *Hanover* case, *supra* at 364-367. However, a municipality's failure to meet its minimum housing obligation "provide[s] compelling evidence that the regional need for housing does in fact outweigh the objections to the proposal." *Id.* at 367.

2. *Computation of Greenfield's minimum housing obligation.* The board did not contend before HAC that Greenfield had satisfied its minimum housing obligation under the second and third criteria stated in G. L. c. 40B, § 20. See note 5, *supra.* The board asserts, however, that at the time of Daddario's initial application for a permit (December 14, 1979) the town's stock of low and moderate income housing satisfied the ten percent criterion and that HAC's determination that the criterion was not met is erroneous.

The board no longer disputes, as it did initially, HAC's calculation that on December 14, 1979, the town had a total of 7,382 housing units. The parties agree that at least 689 of those units were for the benefit of low or moderate income families. To meet the ten percent criterion, Greenfield needed 738 units of low or moderate income housing. The board claims that HAC improperly failed to count a total of

---

[6] A running inventory of subsidized housing is maintained by the Department of Community Affairs (DCA) as part of an ongoing "housing needs study," which is published periodically. The latest two publications of the study at the time that this case arose were printed in 1976 and 1978. For the convenience of prospective applicants under the statute, DCA also maintains records of the total units in a locality and the extent to which the applicable percentage required by G. L. c. 40B, § 20, has been met.

558    15 Mass. App. Ct. 553

Zoning Board of Appeals of Greenfield *v.* Housing Appeals Committee.

140 units which, it asserts, qualify for treatment as low or moderate income housing. These units consist of 105 units in the Weldon Hotel Project, twenty-seven units financed through the Farmers Home Administration (FmHA) § 502 program,[7] see 42 U.S.C. § 1471 (1976 & Supp. 1981), and eight units financed through the Department of Housing and Urban Development (HUD) § 235 program,[8] see 12 U.S.C. § 1715*l* (1976 & Supp. 1981). The burden of proving that some or all of these units should have been counted towards satisfying the town's minimum housing obligation was on the board. See 760 Code Mass. Regs. § 31.06(3) (1978).

The Weldon Hotel Project involves the conversion of a former hotel which has been vacant for a number of years into housing for the elderly. In order for the units in this project to be considered under the ten percent test, they must satisfy the requirements of a regulation of DCA contained in 760 Code Mass. Regs. § 31.04(1)(a) (1978), under the caption "Housing Appeals Committee: Criteria for Decisions under . . . G. L. c. 40B, [§§] 20-23." This regulation expands upon the statutory test by providing that the number of low or moderate income housing units shall be "the number of units, as defined in 760 [Code Mass. Regs. §] 30.02(i), most recently inventoried by the Department as *occupied or available for occupancy or under permit* in the city or town prior to the applicant's initial submission to the local [b]oard; provided that evidence that net additional units *have been occupied or have become available for occupancy* between the date of the most recent inventory and the date of initial application, shall be considered. The [d]epartmental inventory *shall be conclusive* of

---

[7] This is a program of financial assistance to farm owners for construction, repair and alteration of farm buildings so as to provide decent living quarters and working facilities for farmers who are without such amenities and who could not otherwise muster the necessary financial resources to provide for these facilities.

[8] This is a program of mortgage assistance payments and mortgage insurance to enable lower income families to purchase homes.

15 Mass. App. Ct. 553                559

Zoning Board of Appeals of Greenfield v. Housing Appeals Committee.

the number of units up to the time of the most recent inventory prior to initial application." (Emphasis added.) As of December 14, 1979, the critical date in this case, all that the Weldon Hotel Project had obtained was a Federal rental assistance contract pursuant to 42 U.S.C. § 1437f (1976 & Supp. 1981),[9] and a special zoning permit from the board authorizing deviations from the town's zoning by-law.

No attack has been made on the validity of regulation § 31.04(1)(a), which obviously has been promulgated in keeping with the principle "that the Legislature may delegate to a board or an individual officer the working out of the details of a policy adopted by the Legislature." *Commonwealth* v. *Diaz*, 326 Mass. 525, 527 (1950). See *Purity Supreme, Inc.* v. *Attorney Gen.*, 380 Mass. 762, 774 (1980). By its plain terms the regulation limits consideration to those units in DCA's inventory which are "occupied or available for occupancy or under permit" as of the date of the developer's initial application to the board. It is undisputed that the DCA's latest inventory prior to December 14, 1979, did not list the Weldon Hotel Project as one which was "occupied or available for occupancy or under permit." This inventory is conclusive of the status quo as of the date of its making. 760 Code Mass. Regs. § 31.04(1)(a) (1978). The regulation further provides that "evidence that net additional units have been occupied or have become available for occupancy between the date of the most recent inventory and the date of initial application, shall be considered." *Ibid.* It is undisputed that none of the units in the Weldon Hotel Project met this requirement for supplementation of the DCA's inventory. A reasonable regulation of an administrative agency which is clear and unambiguous on its face must, like a comparable statute, be applied according to its terms. See *Purity Supreme, Inc.* v. *Attorney Gen., supra* at 782; *Costello* v. *Board of Appeals of Lexington*, 3 Mass. App. Ct. 441, 446 (1975).

---

[9] This program provides funds to be used by public housing agencies which contract to make assistance payments to owners of dwelling units to be made available to low income renters on a reduced rent basis.

The board argues, nevertheless, that the "under permit" provision in the first clause of regulation § 31.04(1)(a) should be construed to cover the Weldon Hotel Project because the project's developer had a special zoning permit at the time of Daddario's application. We take this as an argument that, despite the language of the regulation, the units should have been included in the applicable inventory because of the existence of the zoning permit.

It appears that HAC has consistently interpreted the phrase "under permit" to mean that a building permit has issued. The interpretation an administrative body gives to its own rule is entitled to deference by a court. *Finkelstein* v. *Board of Registration in Optometry*, 370 Mass. 476, 478 (1976). *Fioravanti* v. *State Racing Commn.*, 6 Mass. App. Ct. 299, 302 (1978). HAC's interpretation of the words "under permit" recognizes and accounts for the bureaucratic obstacles usually encountered by a developer of governmentally subsidized housing. The grant of a special zoning permit may be one of the first steps in a typically long series of approvals needed for such a project. On the other hand, the issuance of a building permit usually signifies that the project's construction is imminent. Between the two events a project could be (and many are) abandoned for any number of reasons. Abandonment is much less likely where the project has progressed to the building permit stage, an event which presupposes that detailed plans and specifications have been prepared. Thus, the issuance of a building permit could be deemed of significance in the sense of assuring that the accuracy of the DCA's inventory will not be distorted by the inclusion of units which may never become available for occupancy. HAC's interpretation of the words "under permit" in its computational framework is reasonable and in furtherance of the object sought to be accomplished by the statute. Absence of a building permit for the Weldon Hotel Project on December 14, 1979, is fatal to the board's claim.[10] We therefore con-

---

[10] There is nothing of precedential value in a 1975 opinion of HAC brought to our attention by the board which permitted inclusion in the

15 Mass. App. Ct. 553                    561

Zoning Board of Appeals of Greenfield v. Housing Appeals Committee.

clude that HAC correctly determined that regulation § 31.04(1)(a) bars the inclusion of any of the 105 Weldon Hotel Project units in the calculation of Greenfield's minimum low and moderate income housing obligation.

Since the 105 units were properly rejected by HAC, Greenfield could not meet the ten percent test at the applicable time even if the remaining thirty-five units of FmHA § 502 and HUD § 235 housing had been counted. As a result, we need not discuss the issues argued by the parties with respect to these units and need not decide whether either category of housing is properly includable in an inventory of low and moderate income housing for purposes of G. L. c. 40B, § 20.

3. *Units in excess of ten percent.* We come to the question whether HAC could lawfully issue a comprehensive permit for a project which will result in Greenfield's having units in excess of the ten percent requirement. The board argues that HAC can order issuance of a comprehensive permit only for the number of units which would have brought Greenfield precisely to the ten percent. A permit which leads to a larger percentage, in the board's view, violates HAC's statutory authority and the Home Rule Amendment, art. 89, of the Amendments to the Constitution of the Commonwealth.

The standard addresses whether "low or moderate income housing exists which is in excess of ten percent of the housing units." These words manifest a legislative intent that local requirements and regulations are conclusively presumed to be "consistent with local needs" *only after* a municipality has achieved ten percent low or moderate income housing.[11] We are obliged to look to the statute's

city of Northampton's inventory of low and moderate income housing of 192 units which had not received a building permit but which were under a firm subsidy commitment at the time of the application for a comprehensive permit. This case was decided by HAC under regulations differing substantially from current regulation § 31.04.

[11] This conclusion is reinforced by comparing the third standard in § 20 (see note 5, *supra*) which is concerned with whether "the application

language as the primary source of its meaning and, when that language is unambiguous, to construe the statute on the basis of what the Legislature has written. *Hoffman* v. *Howmedica, Inc.*, 373 Mass. 32, 37 (1977). *New England Medical Center Hosp., Inc.* v. *Commissioner of Rev.*, 381 Mass. 748, 749-750 (1980). We do not think the Legislature intended to require piecemeal approval of a project so a municipality can hit the ten percent requirement on the button. An attempt to do so would likely be counterproductive and might adversely affect project planning and feasibility by raising the spectre of a forced scale-down of the number of units planned for particular developments.[12] In our view, G. L. c. 40B, § 20, authorizes HAC to issue a permit for a project where the completion of the contemplated units will cause the ten percent requirement to be exceeded by a reasonable number.[13]

---

before the board would result in the commencement of construction of [low or moderate income housing] on sites comprising more than three tenths of one per cent of [a municipality's residentially, commercially, and industrially zoned land] area and or ten acres, whichever is larger, in any one calender year." Unlike the ten percent standard, this standard requires the board to factor in the land use effect of the project under construction and, if the project results in the annual construction land use maximum being surpassed, to reject the request for a permit.

[12] We note in passing that the tests in G. L. c. 40B, § 20, once met, do not restrict the municipality from thereafter granting comprehensive permits for further construction of low or moderate income housing. The standards are analogous to a test for determining HAC's jurisdiction. If any one of them is satisfied, HAC cannot order the issuance of a comprehensive permit over the municipality's objection.

[13] The board hypothesizes that this result would allow HAC to compel a municipality which is but a few units short of meeting its minimum housing obligation to issue a permit for a development of hundreds of units. Although this hypothetical is possible in the abstract, it would not likely develop under practical administration of this statutory scheme. Compliance with the ten percent test relieves a municipality of the necessity of proving that its restrictions are "consistent with local [low income housing] needs," but the statute does not require that a noncomplying city or town issue a permit in every case where the ten percent test has not been met. In such a case the statute imposes a general test of reasonableness predicated on the regional need for low and moderate income housing; the number of low income people in the affected municipality; health

We also see nothing in the board's argument that upholding this permit will violate the Home Rule Amendment which has not already been addressed by the Supreme Judicial Court in the *Hanover* case, 363 Mass. at 355-360. Lastly, it has not been made to appear that this project is otherwise unreasonable and inconsistent with regional needs because of site, design, open space or other considerations. We conclude that HAC's decision was proper and consistent with statutory and constitutional requirements. If a judgment had been entered in keeping with the judge's directions, it would be affirmed. For the reasons discussed earlier as to the defect in the record, however, the entry is

*Appeal dismissed.*

---

and safety considerations; and the promotion of compatible site and building design and preservation of open spaces. G. L. c. 40B, § 20. We think the statute provides an adequate decisional framework for dealing with the problem of proposed developments which could cause a community to overshoot substantially the ten percent benchmark for low and moderate income housing.